## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| CrowdStrike, Inc.<br><br>    Plaintiff,<br><br>v.<br><br>Delta Air Lines, Inc.,<br><br>    Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff CrowdStrike, Inc. ("CrowdStrike") states as follows for its complaint against Defendant Delta Air Lines, Inc. ("Delta").

## INTRODUCTION

1. This action arises from Delta's threats to blame CrowdStrike for Delta's own failures and poor IT infrastructure. After CrowdStrike released a problematic content update on July 19, 2024 that affected Delta among many other CrowdStrike customers, CrowdStrike quickly identified the cause of the issue, remedied it, and pushed out a fix, all within a matter of hours. But, in contrast to other major airlines that resumed near-normal levels of operations by the following day, July 20, Delta struggled to resume near-normal levels of operations for days.

2. Delta now attempts to shift blame to CrowdStrike, demanding at least $500 million from CrowdStrike, despite a clause in the agreement governing Delta and CrowdStrike's relationship that limits any potential damages.

3. CrowdStrike is a leading cybersecurity company that provides the Falcon platform, which includes endpoint security protection and threat intelligence, among other capabilities. A central piece of the Falcon platform is software called the Falcon sensor. The sensor is an application installed locally on end-point computers.

4. On July 19, 2024, as part of regular operations, CrowdStrike released a content update to the sensor at 12:09 a.m. ET for the Windows sensor that resulted in a system crash.

5. CrowdStrike immediately identified the cause of the issue, remedied it, and pushed out a fix. CrowdStrike worked diligently with its customers to restore affected systems as quickly as possible and provide any additional help necessary. Throughout the process and the days that followed, CrowdStrike provided continuous and transparent updates to customers.

6. But Delta failed to resume normal operations for days. Despite the immediate response from CrowdStrike, it was Delta's own response and IT infrastructure that caused delays in Delta's ability to resume normal operation, resulting in a longer recovery period than other major airlines.

7. With Delta facing criticism for its lackluster response, including a federal investigation, Delta threatened to sue CrowdStrike. In a July 29, 2024 letter, Delta accused CrowdStrike of gross negligence and claimed that CrowdStrike owes Delta at least $500 million in purported damages from the problematic content update. On August 8, 2024, in another letter, Delta reiterated its claim for outsized damages and doubled-down on its allegations that the July 19 incident was the result of CrowdStrike's gross negligence. But Delta knows its contract with CrowdStrike has "limitation of liability" and "exclusion of consequential damages" provisions, which limit the parties' liability and excludes any indirect, incidental, punitive, or consequential damages of any kind.

8. In light of Delta's threatened legal action, CrowdStrike brings this action to make clear that CrowdStrike in no way acted grossly negligent or committed willful misconduct and certainly did not cause the harm that Delta claims. CrowdStrike brings this declaratory judgment action, pursuant to 28 U.S.C. § 2201, for a declaration that (1) the liability limitations set forth in the parties' June 30, 2022 Subscription Services Agreement apply to this dispute between Delta and CrowdStrike; (2) the parties are not liable to each other for any indirect, incidental, punitive, or consequential damages of any kind related to this dispute under the same agreement; and (3) CrowdStrike was neither grossly negligent nor did it commit willful misconduct.

## PARTIES

9. CrowdStrike is a Delaware corporation with its primary place of business in Sunnyvale, California.

10. Defendant Delta Air Lines, Inc. is a Delaware corporation with its primary place of business in Atlanta, Georgia.

## JURISDICTION & VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1331 because resolution of this action and Delta's threatened claims and alleged damages against CrowdStrike turn on the Court's application, interpretation, and determination of a number of federal laws and/or regulations.

12. Section 12.1 of the agreement between CrowdStrike and Delta requires Delta to comply with "all federal, foreign, provincial, state and local laws, statutes, regulations, rules, executive orders, supervisory requirements, directives, interpretive letters and other official releases of any Governmental Authority" applicable to Delta. Resolution of this action will necessarily involve analysis of Delta's compliance with this provision. For instance, and of particular relevance here, Delta's own performance under the agreement will turn on whether Delta complied with (i) the TSA's March 7, 2023 cybersecurity emergency amendment to the TSA's security programs; (ii) the Montreal Convention (May 28, 1999 (entered into force on Nov. 4, 2003) reprinted in S. Treaty Doc. No. 106-45, 1999 WL

33292734 (2000)); (iii) DOT regulation 14 C.F.R. § 259.5(b)(14); and (iv) 49 U.S.C. § 41712. This Court thus has jurisdiction under 28 U.S.C. § 1331. *See Household Bank v. JFS Grp.*, 320 F.3d 1249, 1259 (11th Cir. 2003); *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983) ("Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.").

13. Further, the relevance of federal law is further confirmed by the fact that in two class actions (currently pending in federal court) in which Delta consumers seek to recover damages incurred as a result of Delta's delayed outage and mass flight delays and cancellations following the July 19 incident, Delta has invoked and liberally cited to federal law. Specifically, on September 30, Delta filed motions to dismiss in two cases, *Khaku v. Delta Air Lines, Inc.*, No. 24-cv-03594-MHC and *Bajra v. Delta Air Lines, Inc.*, No. 24-cv-03477-MHC, both pending in the United States District Court for the Northern District of Georgia. In both motions, Delta's primary argument for dismissal of the complaints against it is that plaintiffs' claims for damages were preempted by the Airline Deregulation Act, 49 U.S.C. § 1371, *et seq*. ("ADA"). Delta claims that plaintiffs' state consumer protection claims are preempted by the ADA and that so are plaintiffs' breach of contract claims, and that, as a result, plaintiffs' damages are limited under Delta's

contract of carriage with plaintiffs and the ADA.[1] Because Delta is seeking damages from CrowdStrike for the damages that Delta paid or will pay its customers, the determination of whether those damages are recoverable necessarily involve Delta's contract of carriage and/or the ADA and whether those damages are direct or consequential. As a result, Delta's claims against CrowdStrike necessarily involve a substantial question of federal law.

14. Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) & (c) because Defendant Delta's principal place of business is located in Atlanta, Georgia.

## FACTUAL ALLEGATIONS

**A.    The July 19 Incident**

15. With the release of sensor version 7.11 in February 2024, CrowdStrike introduced a new Template Type to enable visibility into and detection of novel attack techniques.

---

[1] In addition, beyond the contract of carriage and/or the ADA, Delta notes that any liability owed in connection with international flights is further limited under Rule 18 of the International Contract, the Warsaw Convention, and the Montreal Convention. *See* Convention for the Unification of Certain Rules for the International Carriage by Air, at Art. 20(1), done at Montreal, Canada, May 28, 1999, *reprinted in* S. Treaty Doc. No. 106–45, 1999 WL 33292734; Convention for the Unification of Certain Rules relating to International Carriage by Air, at Art. 21(2), done at Warsaw, Oct. 12, 1929, *reprinted in* note following 49 U.S.C. § 40105 (1997).

16.  The new Template Type was developed and tested according to CrowdStrike's standard Sensor Content development processes. Both manual and automated testing were performed during the development of this Template Type. This included stress testing across many aspects, such as resource utilization, system performance impact, and detection volume. On March 5, 2024, a stress test of the Template Type was executed in CrowdStrike's staging environment. For each Template Type, a specific Template Instance is used to stress test the Template Type. The tests did not trigger a fault.

17.  On July 19, 2024, two Template Instances were deployed as part of a content update. The sensor expected 20 input fields, while the update provided 21 input fields. In this instance, the mismatch resulted in an out-of-bounds memory read, causing a system crash.

18.  The content update that caused the system crash was remediated on Friday, July 19, 2024 at 5:27 UTC.

B.  **CrowdStrike's Prompt And Effective Remediation**

19.  After the incident, CrowdStrike moved as quickly as possible to remediate issues caused by the update, including reverting the July 19 update 78 minutes after it was initially deployed. CrowdStrike began working with customers and partners to bring systems online as quickly as possible, initially through manual

7

remediation.  On July 22, 2024, CrowdStrike introduced automated techniques to accelerate remediation.

20. Besides rapidly pushing out fixes to the issue, CrowdStrike worked diligently with its customers—including Delta—to restore the affected systems as quickly as possible.  These efforts enabled many of CrowdStrike's customers to restore their affected systems within hours following the incident.  To further help customers quickly restore their affected systems, CrowdStrike deployed personnel and engaged with strategic partner services teams—at its own expense—to assist customers with recovery efforts, even offering to send personnel directly on-site to customers to help remediate the issue.

21. CrowdStrike's response to Delta specifically was just as diligent.  As with its other customers, CrowdStrike immediately sought to work with Delta to help remediate the issue.  Soon after the incident and the days that followed, CrowdStrike was in frequent communication with Delta, helping Delta work through solutions and generally doing whatever CrowdStrike could do to help Delta fix the issues it was experiencing.

### C. Delta's Slow Recovery And Questions Regarding Delta's Compliance With Federal Rules and Regulations

22. Delta's delayed outage has drawn regulatory scrutiny and raises concerns with respect to its compliance to federal statutes, rules, and regulations.

23. On March 7, 2023, the U.S. Transportation Security Administration ("TSA") issued a new cybersecurity amendment to the security programs of certain TSA-regulated airport and aircraft operators.[2] Among other things, Delta was required to "[d]evelop network segmentation policies and controls to ensure that operational technology systems can continue to safely operate in the event that an information technology system has been compromised, and vice versa" and "[r]educe the risk of exploitation of unpatched systems through the application of security patches and updates for operating systems, applications, drivers and firmware on critical cyber systems in a timely manner using a risk-based methodology."[3]

24. Upon information and belief, Delta's delayed recovery from the July 19 incident was the result of non-compliance with, among other things, the TSA's March 7, 2023 cybersecurity amendment. Delta's response to the outage and CrowdStrike's efforts to help remediate the issues revealed technological shortcomings and failures to follow security best practices, including outdated IT systems, issues in Delta's active directory environment, and thousands of compromised passwords. CrowdStrike engineers also detected a custom script

---

[2]  *See TSA Issues New Cybersecurity Requirements for Airport and Aircraft Operators*, TSA (Mar. 7, 2023).

[3]  *Id.*

9

running daily on thousands of Delta machines, further indicating that Delta had previously recognized a lack of proper hygiene in its systems. CrowdStrike did not identify this issue on other customers' systems, indicating it was unique to Delta.

25. In addition, through this action, CrowdStrike seeks to prevent Delta from passing onto CrowdStrike any fines, penalties, or other required payments Delta may incur from its failure to follow federal guidelines. On July 23, the U.S. Department of Transportation ("DOT") launched an investigation into Delta's delayed recovery and mass cancellations following the July 19 incident. The DOT's investigation remains ongoing and could result in the DOT levying monetary fines against Delta pursuant to 49 U.S.C. § 46301.

26. Indeed, the primary issue is whether and, if so, to what extent, Delta may recover from delays caused by its own actions. An airline, like Delta, is required, by federal regulation, to adopt a "Customer Service Plan," which addresses, among other topics, "the services [the airline] provides to mitigate passenger inconveniences resulting from flight cancellations and misconnections." *See* 14 C.F.R. § 259.5(b)(14). Airlines have largely adopted Customer Service Plans that offer different compensation or accommodations depending on whether the cancellation or delay was controllable.[4]

---

[4] *See* Airline Cancellation and Delay Dashboard, U.S. Dep't of Transp., https://www.transportation.gov/airconsumer/airline-cancellation-delay-dashboard.

27. Here, the DOT recently deemed any flight delays and/or cancellations resulting from the July 19 incident to be a "controllable" event—meaning an event caused by the airline.[5] In its July 29 letter, Delta made clear that it seeks to recover those monies from CrowdStrike claiming that the July 19 incident "forc[ed] flight cancellations and delays, and adversely affect[ed] more than a million Delta customers."

28. Likewise, the Montreal Convention imposes certain obligations on Delta to customers travelling internationally and the FAA Reauthorization Act of 2024 (PL 118-63) provides customers with rights following cancellations and delays.

29. Thus, to the extent Delta neglected to comply with these obligations, Delta should not be permitted to seek recovery from CrowdStrike. And, if Delta takes the position—as it did in the July 29 Letter—that CrowdStrike must cover these costs, then such analysis will necessarily require analysis of what actions federal law demanded Delta take.

### D. The Agreement Governing The Relationship Between Delta And CrowdStrike

30. On June 30, 2022, CrowdStrike and Delta entered into a Subscription Services Agreement (the "Agreement"), which governs the terms and conditions

---

[5] *Id.*

related to the provision of CrowdStrike's "Subscription Services" to Delta. "Subscription Services," as defined in the Agreement, include protections offered by the Falcon platform. The Agreement sets out the respective rights and responsibilities of CrowdStrike and Delta concerning the provision of the Subscription Services, including CrowdStrike's responsibility to make available and host the Subscription Services, Delta's responsibility to provide CrowdStrike the "cooperation and information reasonably necessary to implement the Subscription Services for Delta," and restrictions on Delta's use and access to the Subscription Services.

31. The Agreement has an Effective Date of June 30, 2022, and remains in force for three years from that date.

32. Section 12.1 of the Agreement requires Delta to comply with "all federal, foreign, provincial, state and local laws, statutes, regulations, rules, executive orders, supervisory requirements, directives, interpretive letters and other official releases of any Governmental Authority."

33. The Agreement also contains two provisions that limit any liability that may arise out of the agreement. Section 9.1 of the Agreement, titled "LIMITATION OF LIABILITY" states:

> Each party's liability to the other for all claims arising out of this agreement, whether in contract, tort, or otherwise, will not exceed two (2) times the value of the fees paid to service provider for the relevant subscription services subscription term.

34. Section 9.2 of the Agreement, titled "EXCLUSION OF CONSEQUENTIAL DAMAGES" states:

> In no event will either party be liable to the other for any indirect, incidental, punitive or consequential damages of any kind, including but not limited to lost revenues, profits, or goodwill, for any matter arising out of this agreement, whether such liability is asserted on the basis of contract, tort or otherwise, even if a party has been advised of the possibility of such damages.

35. The Agreement (at Section 9.3) specifies only three exceptions to the limitation of liability and exclusion of consequential damages provision. It provides in relevant part:

> The foregoing limitation of liability and exclusion of consequential damages set out in Sections 9.1 and 9.2 shall not apply to: … (c) liability and damages arising out of a party's gross negligence or willful misconduct.

**E.     Delta's Threatened Suit**

36. On July 29, 2024, Delta, through its counsel, notified its intent to file suit against CrowdStrike. Ex. 1 (July 29, 2024 letter from D. Boies to C. Anderson).

37. In the letter, Delta claimed that CrowdStrike was engaged in grossly negligent or willful misconduct when it allegedly failed to stress test and validate the content update before deployment.

38. Delta also indicates in the letter that it plans to seek indirect, incidental, punitive, or consequential damages from CrowdStrike that stem from Delta's own obligations to its customers.

39. As stated in the letter, Delta asserts that the update released on July 19 caused a shutdown of Delta's systems "*which, in turn, caused* a crippling disruption to Delta's operations for several days, forcing flight cancellations and delays, and adversely affecting more than a million Delta customers." Ex. 1 (July 29, 2024 letter from D. Boies to C. Anderson) (emphasis added). Delta's liability to its customers is governed by a number of federal statutes and regulations, including but not limited to FAA Reauthorization Act of 2024 (PL 118-63), 49 USC § 41712, 14 C.F.R. § 260.6(e)(1), 14 C.F.R. § 260.7, and the Montreal Convention, such that Delta's claim for damages against CrowdStrike and its assessment necessarily implicate the analysis, interpretation, and implication of these federal statutes, regulations, and rules.

## CAUSE OF ACTION

## COUNT 1

## DECLARATORY JUDGMENT

## (28 U.S.C. § 2201)

40. CrowdStrike alleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

41. CrowdStrike and Delta contracted for the services that CrowdStrike provided.

42. Delta has threatened to sue CrowdStrike for gross negligence or willful misconduct in connection with the services CrowdStrike provided.

43. As an actual justiciable controversy exists by way of the credible threat of immediate litigation relating to the liability limitation and waiver of the right to consequential damages in the Agreement, and CrowdStrike thus seeks relief from this Court.

44. The parties have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

45. Any claim Delta might assert against CrowdStrike arising out of the Falcon update is covered under the parties' Agreement. Therefore, Delta's damages claim is limited as set forth in the Agreement, and its claim for indirect, incidental, punitive, or consequential damages is barred under the same Agreement.

46. Delta also cannot establish that, under the laws of the state of Georgia, CrowdStrike engaged in grossly negligent or willful misconduct.

47. CrowdStrike is therefore entitled to a declaration pursuant to 28 U.S.C. § 2201 that:

> Any potential damages claim by Delta arising out of or in connection with the outage occurring on July 19, 2024 is limited as set forth in the parties' June 30, 2022 Subscription Services Agreement.
>
> Specifically, under Section 9.1 of the Subscription Services Agreement, CrowdStrike's liability to Delta for any damages in any way related to the July 19 Incident, if any, is limited to two times the value of the fees

paid to CrowdStrike by Delta for the relevant Subscription Services Subscription Term.

In addition, under Section 9.2 of the Subscription Services Agreement, neither Delta nor CrowdStrike are liable to the other for any indirect, incidental, punitive, or consequential damages of any kind related in any way to the July 19 Incident, including, but not limited to, lost revenues, profits, or goodwill.  Further, any damages suffered by Delta following the July 19 Incident are the result primarily of Delta's own negligence, as evidenced by, among other things, its violation of 49 U.S.C. § 41712 by committing unfair or deceptive practices.

CrowdStrike was not grossly negligent and did not commit willful misconduct in any way in connection with July 19 Falcon update.

## **PRAYER FOR RELIEF**

For these reasons, CrowdStrike respectfully requests that the Court enter judgment in its favor and against Delta on Count I, including:

a. granting a declaration consistent with that requested in paragraph 47 of this complaint.

b. awarding costs, including attorney's fees; and

c. granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rule of Civil Procedure, Plaintiff demands trial by jury on all claims so triable.

Dated:  October 25, 2024

        Respectfully submitted,

        */s/ Michael A. Caplan*
        Michael A. Caplan
        Georgia Bar No. 601039
        Julia Blackburn Stone
        Georgia Bar No. 200070
        **CAPLAN COBB LLC**
        75 Fourteenth Street NE, Suite 2700
        Atlanta, Georgia 30309
        Tel:   (404) 596-5600
        Fax:   (404) 596-5604
        *mcaplan@caplancobb.com*
        *jstone@caplancobb.com*

        Michael B. Carlinsky
         (*pro hac vice* forthcoming)
        Ellyde R. Thompson
         (*pro hac vice* forthcoming)
        Kaitlin P. Sheehan
         (*pro hac vice* forthcoming)
        **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
        51 Madison Avenue, 22nd Floor
        New York, New York 10010
        Tel:   (212) 849-7000
        Fax:   (212) 849-7100
        *michaelcarlinsky@quinnemanuel.com*
        *ellydethompson@quinnemanuel.com*
        *kaitlinsheehan@quinnemanuel.com*

        Victoria F. Maroulis
         (*pro hac vice* forthcoming)
        **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
        555 Twin Dolphin Drive, 5th Floor
        Redwood Shores, California 94065
        Tel:   (650) 801-5000

Fax:   (650) 801-5100
*victoriamaroulis@quinnemanuel.com*

Deepa Acharya
 (*pro hac vice* forthcoming)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Stret NW
Suite 900
Washington, D.C. 20005
Tel:   (202) 538-8000
Fax:   (202) 538-8100
*deepaacharya@quinnemanuel.com*


*Attorneys for Plaintiff CrowdStrike, Inc.*